UNION PAVING CO. et al. v. UNITED STATES, for Use of SOULE STEEL CO.

No. 10571.

Circuit Court of Appeals, Ninth Circuit.

June 29, 1945.

Dion R. Holm, Deputy City Atty., and Henry F. Wrigley, both of San Francisco, Cal., for appellants.

Thelen & Marrin and Courtney L. Moore, all of San Francisco, Cal., for appellee.

Before GARRECHT, MATHEWS, and STEPHENS, Circuit Judges.

---

MATHEWS, Circuit Judge.

On November 4, 1939, a contract was awarded to Union Paving Company, hereafter called Union, for the construction of public work of the United States, namely, abutments and piers for a bridge over the Pit River in California. The work was more particularly described in specifications which were part of the contract. The contract was to be performed and executed in the Northern District of California. The total amount payable by the terms of the contract was $1,138,288. Before the contract was awarded, Union furnished to the United States, for the protection of persons supplying labor and material in the prosecution of the work, a payment bond in the sum of $455,315.20 (40% of $1,138,288), as required by § 1 of the Act of August 24, 1935, c. 642, 49 Stat. 793, 40 U.S.C.A.. § 270a. Sureties on the bond were Pacific Indemnity Company and Maryland Casualty Company. On January 6, 1940, Union made a subcontract with Soule Steel Company, hereafter called Soule, whereby Soule agreed to do a part of the work— the part described in the subcontract. The subcontract provided:

"The subcontractor [Soule] at its own cost agrees to provide all labor, materials, tools and equipment or other means and promptly unload all reinforcement bars[1] from cars delivered at Redding, California[2] check and haul the same to the job site and provide suitable warehouse or other means of protection for any material requiring storage or protection * * *

"The subcontractor at its own cost agrees to provide all labor, wire, wire ties, rods or other materials and appliances used for securing reinforcement bars, metal or other temporary supports, if used, to hold reinforcement bars during the placing of concrete, including backing-up strip required for welding * * *

"The subcontractor at its own cost agrees to provide all labor, materials and equipment and cut the ends of the bars for welding and provide all clamps, tie rods, cables, blocking, anchors and other accessories that may be required, including the placement of backing-up strips, and shall firmly and securely hold the reinforcing bars in position while the joints are being welded * * *

"The subcontractor at its own cost agrees to provide all labor, materials, tools, accessories and equipment and perform and observe all the provisions contained in paragraph 66 of [the specifications of Union's contract with the United States].[3]

---

[1] Steel bars to reinforce concrete of which the abutments and piers were constructed.

[2] Paragraph 23 of the specifications of Union's contract with the United States provided that the United States would furnish the bars and deliver them to Union f.o.b. cars at Redding, California.

[3] Paragraph 66 provided: "Steel reinforcement bars shall be placed in the concrete wherever shown on the drawings or where directed by the contracting officer. The reinforcement bars will be furnished to the contractor [Union] by the Government as provided in paragraph 23. Unless otherwise shown on the drawings or directed by the contracting officer, measurements made in placing the bars shall be to the center lines of the bars. If more than one grade of reinforcement bar is furnished, the contractor shall use proper precautions, satisfactory to the contracting officer, to prevent the use of the wrong grade of reinforcement bar in any part of the work. The exact position, size, and shape of reinforcement bars are not shown in all cases on the drawings, and where not shown they shall be in all respects as specified by the contracting officer, and where necessary, as determined by the contracting officer, the con-

tractor will be furnished supplemental detail drawings or lists which will give the information necessary for cutting, bending, and placing the reinforcement bars. Before the reinforcement bars are placed, the surfaces of the bars and the surfaces of any metal supports for reinforcement bars shall be cleaned of objectionable rust, scale, dirt, grease, or other foreign substances, and after being placed, the reinforcement bars shall be maintained in a clean condition until they are completely embedded in the concrete. The Government will make every reasonable effort to have the reinforcement bars delivered to the contractor in good condition, but this shall not relieve the contractor from full responsibility for the condition of the bars immediately prior to covering them with concrete. Reinforcement bars shall be accurately placed and secured in position so that they will not be displaced during the placing of the concrete, and special care shall be exercised to prevent any disturbance of the reinforcement bars in concrete that has already been placed. Metal chairs, metal hangers, metal spacers, or other metal supports satisfactory to the contracting officer may be furnished and used by the contractor for supporting reinforcement bars. Where-

"Time is of the essence of this agreement and the subcontractor agrees that it will proceed with the placing of reinforcement bars in sections of the piers and abutments made ready for such placement immediately after being notified by the contractor [Union] of the readiness of each section and prosecute the same diligently to completion, unless prevented by strikes, lockouts or other contingencies beyond its control. * * *

"The contractor at its own cost agrees to provide an accessible roadway from Highway 99 to the base of all piers and abutments; construct a wooden trestle over and about the base of all pier excavations and construct wooden cores as shown on the plans which may be used by the subcontractor as a supplementary support for reinforcement bars; * * *

"The contractor agrees to pay said subcontractor for placing reinforcement bars at the rate of $22.50 per ton for reinforcement bars actually placed in accordance with the plans and specifications, which shall be considered as full compensation for unloading, warehousing, hauling, bending and placing reinforcement bars and clamps, and doing all work necessary or incidental thereto and for furnishing all tie wire, clamps and supporting devices. * * *

"Payments are to be made to subcontractor on or about the 10th of the following month for 85% of the value of the work performed during the preceding month, and the remaining 15% to be paid thirty days after completion of said subcontractor's portion of the work."

Between January 6, 1940, and May 31, 1941, Soule placed 5,533.125 tons of reinforcement bars, as required by the subcontract, and, at Union's request, supplied labor and materials which were not required by the subcontract, but were required by Union's contract with the United States, and were of the reasonable value of $671.84. The work provided for in the subcontract was completed on or about May 31, 1941. Soule was charged by Union $102.18 for reinforcement bars delivered to Soule and not accounted for and was paid by Union $47,712.35 on or before July 18, 1941, and $16,000 on December 31, 1941. There was no further payment.

A suit against Union and its sureties was brought in the name of the United States for the use of Soule.[4] The complaint alleged that from July 18, 1941, to December 31, 1941, Union owed Soule the principal sum of $77,352.62, and that from and after December 31, 1941, Union owed Soule the principal sum of $61,352.62.[5] The complaint prayed judgment for $61,352.62, for interest on $77,352.62 from July 18, 1941, to December 31, 1941, for interest on $61,352.62 from December 31, 1941, until paid, and for costs. Union and its sureties answered the complaint, jury trial was waived, the case was tried by the court, findings of fact and conclusions of law were stated, and judgment was entered as prayed in the complaint. Union and its sureties have appealed.

Questions presented are (1) whether, by the terms of the subcontract, Soule was obligated to pay the cost of the falsework hereinafter mentioned; (2) whether, upon learning that it was being charged with the cost of the falsework, it was Soule's duty to rescind the subcontract; and (3) whether the court erred in admitting evidence of negotiations leading up to the subcontract.

---

ever necessary, in the opinion of the contracting officer, to prevent future damage to the concrete or unsightly rust stains on exposed concrete surfaces, all such supports for reinforcement bars shall be made of noncorrodible metal. Payment for placing reinforcement bars will be made at the unit price per pound bid therefor in the schedule, which unit price shall include the cost of furnishing and attaching wire ties and metal supports if used, of unloading, hauling, sorting, storing, cutting, bending, cleaning, placing, and securing and maintaining in position all reinforcement bars, as shown on the drawings or as directed by the contracting officer.

4 See § 2 of the Act of August 24, 1935, c. 642, 49 Stat. 794, 40 U.S.C.A. § 270b.

5 Computed as follows:

| | |
|---|---:|
| Placing 5,533.125 tons of reinforcement bars at $22.50 per ton, | $124,495.31 |
| Labor and materials not required by the subcontract, | 671.84 |
| Total, | $125,167.15 |
| Charged for reinforcement bars delivered to Soule and not accounted for, | 102.18 |
| Balance, | $125,064.97 |
| Paid on or before July 18, 1941, | 47,712.35 |
| Balance, | $ 77,352.62 |
| Paid December 31, 1941, | 16,000.00 |
| Balance, | $ 61,352.62 |

I. The evidence showed that in one of the abutments and seven of the piers (abutment 1 and piers 1-7) provided for in Union's contract with the United States, Union erected falsework;[6] that Union used the falsework in pouring concrete; and that Soule used it to support and hold reinforcement bars while concrete was being poured. After October 18, 1940, Union charged Soule for erecting falsework $61,-112.35 (claimed to be its cost), contending that, by the terms of the subcontract, Soule was obligated to erect the falsework or to pay the cost thereof. Soule contended that, by the terms of the subcontract, Union was obligated to construct the falsework at its own cost.

The subcontract did not provide that Soule should pour any concrete or erect any falsework to be used in pouring concrete. It did not, in terms, provide for the erection of falsework for any purpose. It did, however, provide that Soule should, at its own cost, "provide all * * * metal or other temporary supports, if used, to hold reinforcement bars during the placing of concrete." Union contended that the falsework erected in abutment 1 and piers 1-7 constituted such a "temporary support." The subcontract also provided that Soule should "proceed with the placing of reinforcement bars in sections of the piers and abutments made ready for such placement immediately after being notified by [Union] of the readiness of each section." Obviously, the duty of making the sections "ready" rested on Union, not on Soule. Soule contended that the erection of falsework in abutment 1 and piers 1-7 was a part of that duty.

The court correctly concluded that the subcontract was ambiguous, indefinite and uncertain in that it did not clearly appear therefrom whose duty or obligation it was to erect and pay the cost of the falsework. Accordingly, the court admitted evidence concerning the negotiations leading up to the subcontract. The court found that in the negotiations, Union represented that it would erect and pay the cost of the falsework and that Soule could use the falsework, without cost to itself, for the purpose of supporting reinforcement bars and securing them in position; that Soule, relying on these representations, eliminated from its estimate the cost of a steel structure which it had contemplated using for that purpose and reduced its estimate from

$28.60 per ton to $22.50 per ton (the subcontract price); and that on December 29, 1939, it was verbally agreed by and between Union and Soule that Union should erect and pay the cost of the falsework and that Soule should have the free use thereof.

The court further found that Union prepared the subcontract; that any ambiguity, indefiniteness or uncertainty existing therein was caused by Union; that at the time of the execution of the subcontract, the provision that Soule should "proceed with the placing of reinforcement bars in sections of the piers and abutments ready for such placement immediately after being notified by [Union] of the readiness of each section" was understood by Soule to mean that Union should erect and pay the cost of the falsework and that Soule should have the free use thereof; that Union knew, at the time the subcontract was executed, that Soule so understood the provision; and that after the execution of the subcontract, the parties, by their acts, construed and interpreted it as providing that Union should erect and pay the cost of the falsework and that Soule should have the free use thereof. These acts were as follows:

(a) From March, 1940, to September, 1940, Soule rendered monthly bills for placing reinforcement bars in accordance with the subcontract. Union paid the bills without objection. It never suggested that they were not due or that they were subject to any countercharge.

(b) From January 6, 1940, to October 18, 1940, Union erected and paid the cost of falsework required in the construction of abutment 1 and piers 1-7. It did not, at anytime during that period, suggest or demand that Soule pay the cost of the falsework or any part thereof.

(c) During the period from January 6, 1940, to October 18, 1940, Soule used the falsework to support reinforcement bars, and Union made no charge for such use.

(d) During the period from January 6, 1940, to October 18, 1940, Union never suggested that it was Soule's duty or obligation to erect the falsework or to pay the cost thereof.

(e) During the period from January 6, 1940, to October 18, 1940, Union never conferred with Soule as to the type or cost of materials used or as to the manner of erecting falsework.

[6] Sometimes called scaffolding and sometimes called interior framework.

(f) On or about January 6, 1940, Union set up a system of cost keeping. In its cost records, during the period from January 6, 1940, to October 18, 1940, Union charged to itself the cost of erecting falsework, as part of the cost of pouring concrete, and did not charge any part thereof to Soule.

(g) During the period from January 6, 1940, to October 18, 1940, Union did not, in its general books of account, make any charge against Soule for the cost of erecting falsework.

■ The court further found that at the time the subcontract was executed, it was the mutual intention of the parties that Union should erect and pay the cost of the falsework and that Soule should have the free use thereof. The findings are amply supported by evidence and are accepted by us as correct. We conclude, as did the court below, that, by the terms of the subcontract, Union was obligated to erect and pay the cost of the falsework, and Soule was not obligated to erect the falsework or to pay the cost thereof.

Appellants say that the $61,112.35 mentioned above included the cost of templates, spacers, and stiffeners which were used exclusively by Soule. Appellants contend that Union should have been credited with the cost of these articles. The evidence shows that these articles were paid for by Soule, not by Union. Appellants' contention is therefore rejected.

■ II. Appellants contend that, upon learning, as it did in October, 1940, that it was being charged with the cost of the falsework, it was Soule's duty to rescind the subcontract. There is no merit in this contention. We assume, without deciding, that Soule could have rescinded the subcontract in October, 1940. However, it was not obliged to do so. It could, as it did, stand on the subcontract [7] and, being at all times ready and able to perform, keep it alive for the benefit of both parties.[8]

■ III. Appellants contend that the court erred in admitting evidence concerning the negotiations leading up to the subcontract. The contention assumes that the subcontract was unambiguous. Actually, as shown above, it was ambiguous, indefinite and uncertain. The evidence was clearly admissible.[9]

Judgment affirmed.

---

[7] 17 C.J.S., Contracts, § 422, pp. 907, 908.

[8] McConnell v. Corona City Water Co., 149 Cal. 60, 85 P. 929, 8 L.R.A.,N.S., 1171; Sobelman v. Maier, 203 Cal. 1, 262 P. 1087; Dyer Bros. Golden West Iron Works v. Central Iron Works, 72 Cal.App. 202, 237 P. 386; O'Connell v. Federal Outfitting Co., 5 Cal.App.2d 327, 42 P.2d 1070; King Features Syndicate v. KMTR Radio Corp., 29 Cal. App.2d 247, 84 P.2d 322.

[9] Balfour v. Fresno Canal & Irrigation Co., 109 Cal. 221, 41 P. 876; Pearsall v. Henry, 153 Cal. 314, 95 P. 154, 159; Joy v. Rousseau, 72 Cal.App. 179, 236 P. 972; 12 Am.Jur., Contracts, § 234, p. 757; 17 C.J.S., Contracts, § 322, p. 750.